**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

DAWGS & DINGOES, LLC,

        Plaintiff,

    v.

THE CITY OF POOLER, and THE MAYOR
AND COUNCIL OF THE CITY OF
POOLER,

        Defendants.

CIVIL ACTION NO.: 4:22-cv-176

**O R D E R**

      This action is before the Court on Defendants the City of Pooler (the "City") and the Mayor

and Council of the City of Pooler's Motion to Dismiss.  (Doc. 21.)  Plaintiff Dawgs & Dingoes,

LLC ("D&D"), commenced this action pursuant to the Fifth and Fourteenth Amendments

following the Council's denial of D&D's application for a proposed multi-use development in the

City. (Doc. 18.)  D&D generally alleges that the denial of the site plan application constituted an

unlawful regulatory taking and violated its rights under the federal and Georgia constitutions.  (Id.)

Defendants' Motion requests the dismissal of D&D's claims on numerous grounds and, in the

alternative, seeks a stay of this action pending the conclusion of a purportedly parallel state

proceeding. (Doc. 21.)  D&D filed a Response, (doc. 32), and Defendants filed a Reply, (doc. 33).

For the reasons more fully explained below, the Court hereby **GRANTS in part and DENIES in part** the Motion.[1]  (Doc. 21.)

**BACKGROUND**

I.       **Factual Background**

The following are all the relevant allegations set forth in the Amended Complaint.  (Doc. 18.)  D&D is a limited liability company, which, at all relevant times, owned approximately 4.39 acres of commercially zoned real property located in Pooler, Georgia (the "Subject Property").  (Id. at pp. 1–2.)  The Subject Property is zoned "C-1, Commercial, light district."  (Id. at p. 9.)

For several years prior to the events at issue here, the City had been encouraging the development of projects along what the Amended Complaint refers to as the City's "Main Street Corridor".  (Id. at p. 3.)  On April 22, 2015, the City publicly announced its plans for a new municipal complex in this area, in an effort to create a new center of economic activity and to spark mixed-use and commercial development in the area.  (Id. at pp. 3–4.)  Over the next few years, the City continued developing a comprehensive plan to develop the area, which ultimately resulted in the City adopting an overlay district, which the Amended Complaint refers to as the "Main Street overlay district," in 2017 (hereinafter, the Main Street overlay district plan will be referred to as the "MOD").  (Id. at pp. 3, 5–8.)  While it included certain specifications for buildings in the district and their uses, the MOD generally allowed for the permitting of mixed-use developments without discretionary review.  (Id. at p. 3, 8.)

D&D first learned of the City's plans to develop the downtown area in late 2016 or early 2017, around the time it decided to purchase its first parcel (which is part of the Subject Property)

---

[1]  Because the Court finds that D&D's briefing adequately addresses Defendants' arguments for purposes of ruling on the Motion to Dismiss, (doc. 21), the Court additionally **DENIES** D&D's Request for Oral Argument on the Motion, (doc. 35).

for $290,000.00.  (Id. at p. 8.)  D&D then spent an additional $662,000.00 between 2016 and 2019 to acquire additional individual parcels along the main street corridor, all of which (together with the first parcel) comprise the Subject Property.  (Id. at pp. 8–9.)  According to the Amended Complaint, the City specifically enticed D&D to develop plans for the Subject Property and to apply for a site development permit, and D&D developed a site plan in reliance on the City's representations.  (Id. at p. 3.)  Following the adoption of the MOD in 2017, D&D consulted with an architect and sought guidance from City officials about what would be a permitted use of the property and whether the City had any preferences.  (Id. at p. 9.)  D&D thereafter engaged in months-long consultations with the City concerning the development of its plans for the Subject Property (the "Site Plan").  (Id.)  In March 2018, D&D met with the City to discuss the specifics of the proposal, which was for a mixed-use development consisting of, *inter alia*, a two-story building housing an oral surgery center and offices.  (Id. at p. 10.)  In this initial meeting, the City Manager expressed enthusiasm for the concept and informed D&D that the concept would be permitted on the Subject Property without discretionary review as long as the Site Plan met the design requirements of the MOD and the underlying Code for C-1 zoning.  (Id. at p. 10.)  The City Manager allegedly discouraged D&D from seeking any variances to the existing plan so as to not invite any discretionary review.  (Id.)  The City Manager additionally recommended that D&D hire an engineer to assist in the creation of the Site Plan, which D&D did.  (Id. at p. 11.)  D&D further met and corresponded with the City Manager and other city officials numerous times throughout 2018 to discuss specifics of the proposal.  (Id. at pp. 11–12.)

D&D understood, based on the City's assurances and the plain language of the MOD, that its proposed concept was permitted on the Subject Property so long as it complied with design standards of the MOD and the C-1 zoning ordinance, and that no discretionary review would be

triggered unless D&D requested a variance.  (Id. at p. 13.)  Following specific instructions and assurances from the City, D&D thereafter paid approximately $205,000 to its development team, bought an additional parcel to accommodate for parking (which the City had stated was necessary to avoid needing a variance), and created site development plans that would permit approval of the entire project under one site development application (rather than developing the Subject Property and seeking approval in phases, which D&D initially intended to do).  (Id. at pp. 13–14.)

D&D submitted the Site Plan application, along with the required supporting documentation (and without a request for a variance) to the City in December 2018.  (Id. at p. 14.) According to the Amended Complaint, the proposed Site Plan complied with both the MOD and the Code for C-1 zoning at the time it was submitted.  (Id. at pp. 7–8, 14–16.)

D&D first received comments from the City in January 2019, which "were routine in nature," only contained minor revisions, and did not indicate any of the proposed uses were prohibited, would require a variance, or were otherwise deficient under the MOD or the Code for C-1 zoning.  (Id. at p. 17.)  However, in March 2019, the City Manager informed D&D that some community members were opposed to the Site Plan, and the City indicated it wished to "buy out" D&D's interest in the Subject Property.  (Id. at pp. 17–18.)  D&D agreed to hear the City's proposal but expressed its desire to proceed with the project.  (Id.)  On April 25, 2019, the City encouraged D&D to submit a new site plan with only one of the buildings, the proposed oral surgery center (the "OSC Site Plan"), and to wait to submit the plan for the remainder of the development (the "Remainder Site Plan") until after the City's elections in November 2019.  (Id. at p. 18.)  The City's representatives indicated that, if D&D staged the development in this manner, the City Council would approve the Remainder Site Plan after the election.  (Id. at pp. 18–19.)  D&D complied with this instruction and submitted the OSC Plan shortly after the meeting.  (Id. at p. 19.)

On May 20, 2019, the City amended the MOD (the "2019 Amendment") to add language that bestowed discretionary review of proposed developments on the Mayor and City Council. (Id. at p. 19.) Per this 2019 Amendment, the Mayor and City Council were now required to "consider the effect of this ordinance on properties which are adjacent to the overlay district in all decisions." (Id.; doc. 18-3, p. 16.) The 2019 Amendment allowed the Mayor and City Council to "place additional requirements . . . on projects in the overlay district" "[w]here development within the overlay district may pose an adverse effect on adjacent properties." (Doc. 18-3, p. 16.) Following the 2019 Amendment, D&D asked the City Manager if the project was "sunk," but the City assured D&D that the project would move forward as planned. (Doc. 18, p. 20.)

The City Council eventually approved the OSC Site Plan in October 2019. (Id.) Per the City's instructions, D&D waited to submit the Remainder Site Plan. (Id.) However, on December 9, 2019, following the City's elections, the City's Planning Commission recommended that the City Council deny the Remainder Site Plan. (Id.) The City Council considered the Remainder Site Plan application on December 16, 2019, and ultimately voted to deny it before hearing public comment on the application. (Id. at pp. 21–22.) According to the Amended Complaint, the City Council's denial was based not on criteria set forth in the MOD or the Code for C-1 zoning, but instead on vague, discretionary concerns for public safety and adverse effects on the neighborhood. (Id. at pp. 22–23.) In support, D&D cites to the fact that then-Mayor-elect Rebecca Benton voted in opposition to the motion to deny the Remainder Site Plan at the December 16 Council meeting, stating that the Remainder Site Plan was consistent with the City's zoning and that it would be arbitrary to vote for its denial. (Id. at p. 23.)

## II.    Procedural History

### A.    D&D's Appeals of the City Council's Denial of the Remainder Site Plan

On January 25, 2020, D&D appealed the City Council's denial to the Superior Court of Chatham County, Georgia.  (Id.)  On June 12, 2020, D&D voluntarily dismissed that action in exchange for the City Council's agreement to reconsider the Remainder Site Plan.  (Id.)  On reconsideration, the Planning Commission recommended that the plan be approved; however, the City Council nevertheless denied the Remainder Site Plan on August 3, 2020.  (Id. at p. 24.)  In September 2020, D&D again appealed the denial of the Remainder Site Plan to the Superior Court of Chatham County.  (Id. at p. 26.)  That appeal remains pending.  (Id.)

### B.    The Present Action

On December 16, 2021, D&D filed this separate action in the Superior Court of Chatham County challenging the denial of the Remainder Site Plan and the 2019 Amendment.  (Id.; see doc. 1-1.)  The original Complaint's caption named as defendants, in addition to the City, the following persons in their individual and official capacities: the Mayor and Council; Rebecca Benton; Stevie Wall; Shannon Black; Karen Williams; Aaron Higgins; John Wilcher; and Tom Hutcherson.  (Doc. 1-1, p. 2.)

Defendants removed the case to this Court on July 21, 2022.  (Doc. 1.)  The next day, on July 22, 2022, Defendants filed their first motion to dismiss, arguing, inter alia, that D&D's claims against the "individual defendants" should be dismissed because (1) the original Complaint contained "nearly no factual allegations about the individual defendants" and (2) qualified immunity shields the Individual Defendants from being sued in their individual capacities.  (Doc. 6.)  In response, D&D sought leave to file a proposed Amended Complaint which dropped the Individual Defendants from the case.  (Doc. 14; see doc. 15, p. 4 ("D&D dismisses the individual

defendants in its proposed . . . Amended Complaint").)  D&D conceded that filing the Amended Complaint would moot the "immunity issues raised as to the individual defendants."  (Doc. 15, p. 4.)  The Court granted Plaintiff's request for leave to file the Amended Complaint as unopposed. (Doc. 17; see doc. 16.)  D&D filed the Amended Complaint on November 27, 2022.  (Doc. 18). The Amended Complaint's caption lists only the City and the Mayor and Council as defendants and omits the seven individually named persons.  (Doc. 18, p. 1.)

In the Amended Complaint, D&D alleges just compensation claims under both the Fifth Amendment (Count I) and Georgia law (Count IV), a substantive due process claim under the Fifth and Fourteenth Amendments (Count II), and a claim for infringement of vested property rights under Georgia law (Count III).  Defendants then filed the updated Motion to Dismiss presently before the Court.  (Doc. 21.)  In their Motion, Defendants move to dismiss all of D&D's claims for the following nine reasons:

> [(1)] because D&D has still not sufficiently alleged a deprivation of beneficial uses of the property, the federal takings claim must fail[;] [(2)] the federal takings [claim] is not ripe because D&D has not fully pursued a takings or inverse-condemnation claim under state law[;] [(3)] to the extent that it is based on the denial of the site plan, the due-process claim must fail because the denial was an executive—rather than legislative—act[;] [(4)] any due-process claim based on the language of the zoning ordinance must fail because the ordinance is rationally related to a legitimate government interest[;] [(5)] any federal claims against individual defendants should be dismissed because those claims are either redundant of the claims against the City itself or barred by qualified immunity[;] [(6)] any claims for damages under state law should be dismissed because D&D fails to allege that the requisite ante litem notice was provided to the City[;] [(7)] the state-law "vested right" claim must fail because D&D fails to allege sufficient facts showing that it received any concrete assurances about the permissibility of developing the property[;] [(8)] the takings claim under the Georgia Constitution must fail for the same reasons as the Fifth Amendment takings claim[; and] [(9)] the individual defendants are shielded by official immunity under state law.

(Id. at pp. 2–3.)  In the alternative, Defendants contend that the Court should stay this case pending resolution of D&D's appeal from the denial of the Remainder Site Plan application pending before

the state court.  (Id. at pp. 3, 26–29.)  D&D filed a Response, (doc. 32), and Defendants filed a

Reply, (doc. 33).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible

on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim

is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating

a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations

in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger

v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  However, this tenet "is inapplicable to

legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  Ashcroft, 556 U.S. at 678.  Rather, "[a] complaint must

state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.'"  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d

1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than

a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are

merely consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief."  Ashcroft, 556 U.S. at 678 (internal quotation marks and

citation omitted).  Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a

dispositive issue of law, no construction of the factual allegations will support the cause of action."

Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993);

see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

## DISCUSSION

### I.   Fifth Amendment Takings Claim (Count I)

D&D brings suit pursuant to 42 U.S.C. § 1983 for violation of its Fifth Amendment rights. (Doc. 18, pp. 27–28.)  D&D alleges that "[t]he City's denials of [its] Site Plan Application and [the City's] 2019 revisions of the . . . MOD, separately and collectively, constituted an unlawful regulatory taking of [its] property without just compensation."  (Id. at 27.)  In their Motion to Dismiss, Defendants argue, in essence, that D&D's takings claim should be dismissed because D&D has failed to allege that its property was deprived of all or substantially all economically beneficial use.[2]  (Doc. 21, p. 9.)  D&D, on the other hand, argues that it does not have to allege such an extreme deprivation of economic benefit and that, under the factors laid out by the Supreme Court in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978), it has alleged a takings claim sufficient to withstand a motion to dismiss.  (Doc. 32, pp. 6–10.) Defendants, in their Reply, do not specifically respond regarding the Penn Central factors and simply reiterate their argument that D&D has not sufficiently alleged a deprivation of beneficial

---

[2] Defendants initially argued that D&D's Fifth Amendment takings claim should also be dismissed because a takings claim is not ripe until a plaintiff "has first exhausted available state-law procedures for obtaining compensation," which, they claim, D&D has failed to here.  (Doc. 21, p. 11.)  However, Defendants ultimately noted their withdrawal of this argument in their Reply brief.  (Doc. 33, pp. 1–2.)  Indeed, in Knick v. Township of Scott, 139 S. Ct. 2162 (2019), the Supreme Court held "[a] property owner may bring a takings claim under [Section] 1983 upon the taking of his property without just compensation by a local government."  139 S. Ct. at 2179.  In doing so the Court explicitly overruled its previous holdings that required a plaintiff to first exhaust state law remedies.  Knick, 139 S. Ct. at 2177–79; S. Grande View Dev. Co., v. City of Alabaster, 1 F.4th 1299, 1305 n.9 (11th Cir. 2021) ("[A] landowner is no longer required to pursue state procedures to secure just compensation under state law before bringing a Fifth Amendment just compensation claim in federal court.").  Accordingly, D&D's purported failure to exhaust state law remedies does not bar this action or render it unripe.

use of the property and that the claim should be dismissed on that ground alone.  (See doc. 33, pp. 2–5.)

The Just Compensation Clause of the Fifth Amendment, which applies to the states by virtue of the Fourteenth Amendment, mandates that "private property" shall not "be taken for public use, without just compensation."  U.S. Const. amend. V; Givens v. Ala. Dep't of Corr., 381 F.3d 1064, 1066 (11th Cir. 2004).  While the classic form of taking occurs when a governmental entity exercises its power of eminent domain through formal condemnation proceedings, a taking can also occur where a governmental entity exercises its police power through regulation which restricts the use of property.  See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005); A.A. Profiles, Inc. v. Ft. Lauderdale, 850 F.2d 1483, 1486 (11th Cir. 1988).  D&D has not alleged a classic taking here and has instead alleged a regulatory taking, which occurs when governmental regulation of private property is "so onerous that its effect is tantamount to a direct appropriation or ouster."  Lingle, 544 U.S. at 537.  "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992).  Thus, the question before the Court on this Motion is whether D&D has plausibly alleged that Defendants' actions "[went] too far" so as to amount to a regulatory taking. Id.

The Supreme Court has "generally eschewed any set formula for determining how far is too far," instead "preferring to engag[e] in . . . essentially ad hoc, factual inquiries."  Id. at 1015 (internal quotations omitted); Penn Central, 438 U.S. at 124 ("[T]his Court . . . has been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government.") (internal quotations omitted).  This "ad hoc, factual inquir[y]" was first set forth in Penn Central, in which the Supreme Court

identified several, non-exhaustive factors for courts to consider in determining whether a regulatory taking has occurred: (1) "[t]he economic impact of the regulation on the claimant," (2) "interfere[nce] with distinct investment-backed expectations," and (3) "the character of the governmental action."  438 U.S. at 124.  The Penn Central inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  Lingle, 544 U.S. at 539.

The Supreme Court has further identified two "per se" takings which do not require this case-specific inquiry: (1) where the government regulation results in some physical invasion of the property; and (2) where the regulation denies *all* economically beneficial or productive use of land. See Lucas, 505 U.S. at 1015–16; Lingle, 544 U.S. at 538.  The second category of per se takings applies only in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 330 (2002).  The Supreme Court has clarified that "[a]nything less than a 'complete elimination of value,' or a 'total loss' . . . would require the kind of analysis applied in Penn Central."  Id. (quoting Lucas, 505 U.S. at 1019 n.8).  Accordingly, the Supreme Court has explained, "the default rule remains that, in the regulatory takings context, we require a more fact specific inquiry."  Id. at 332.

Here, D&D does not claim it has suffered either category of "per se" taking.  (See doc. 32, p. 7 ("D&D does not claim a *per se* taking has occurred."); see generally doc. 18.)  Accordingly, to the extent Defendants contend that D&D's takings claim must be dismissed because D&D has not alleged that the property has been deprived of *all* economic benefit, such argument fails.[3]

---

[3]  In their briefing, Defendants rely on a case from this district, Brantley County Development Partners v. Brantley County, where, after quoting an Eleventh Circuit opinion from 1996 for the proposition that a plaintiff may state a just compensation claim if it can show that it "has been denied all or substantially all economically viable use of its land," the court dismissed the plaintiff's takings claim because, it said,

Because D&D has instead alleged a partial regulatory taking, the proper inquiry is whether D&D

has sufficiently stated a claim for a "Penn Central taking." Lingle, 544 U.S. at 548.[4]

As described above, there is no set "formula" for this particular type of takings claim, but

the Supreme Court, in Penn Central (and Lingle), has identified at least three factors that courts

are to use as "the principal guidelines for resolving regulatory takings claims" such as D&D's

claim here. While it is not clear from Supreme Court or Eleventh Circuit precedent that these

specific factors must be considered in determining whether a party has stated a facially plausible

---

plaintiff had "failed to allege that its property was deprived of *all economic benefit* such that a 'taking' occurred within the meaning of the Fifth Amendment." 559 F. Supp. 3d at 1371 (S.D. Ga. 2021) (emphasis added). Defendants urge that, because the facts and allegations of this case are analogous to those in Brantley County, this Court should dismiss D&D's takings claim, apparently without considering whether a partial taking has been sufficiently alleged pursuant to Penn Central (and Lingle).

As an initial matter, the Court notes that, despite Defendants' contention that Brantley County is "controlling," (doc. 33, p. 5), "[a] district court is not bound by another district court's decision, *or even an opinion by another judge of the same district court*." Fox v. Acadia State Bank, 937 F.2d 1566, 1570 (11th Cir. 1991) (emphasis added). Moreover, the Court has carefully reviewed the case and notes that the 1996 Eleventh Circuit authority on which it relied for the "all or substantially all" standard long predates the Lingle opinion, where the Supreme Court clarified that a plaintiff need not assert that it has been deprived of all economically beneficial use of its property, but that a plaintiff may assert a partial regulatory takings claim and the Penn Central factors should be used to determine if the at-issue regulation has effected an actionable taking. See Lingle, 544 U.S. at 538–39; see also M & N Materials, Inc. v. Town of Gurley, No. CV-14-S-184-NE, 2014 WL 2590473, at *6 n.33 (N.D. Ala. June 10, 2014) (rejecting a similar argument that "the loss of all economically beneficial use of the property" is a "fundamental requirement" for "any regulatory takings claim" and clarifying that while there was pre-Lingle Eleventh Circuit precedent that supported the argument, "Lingle makes clear that a plaintiff can support a regulatory takings [claim] without alleging that its property has been rendered valueless"). Accordingly, the Court is not swayed by Defendants' reliance on Brantley County.

[4] The Court notes that, to even get to the Penn Central analysis, a claimant must "demonstrate that he possesses a 'property interest' that is constitutionally protected." Givens, 381 F.3d at 1066. Defendants did not challenge D&D's takings claim on this ground but do challenge D&D's property interest under its state law vested property rights claim (Count III). (Doc. 21, pp. 21–23.) The Court notes that while Defendants did not raise that argument here, for the same reasons it finds that D&D adequately alleged a vested property right under state law, so too does it find that D&D alleged a vested property right for its Fifth Amendment claim. See infra, Discussion Section IV.B; Givens, 381 F.3d at 1069–70 (finding no property right existed under Alabama law and thus there was no "property interest" to support a takings claim under either federal or state law); DeKalb Stone, Inc. v. Cnty. of DeKalb, 106 F.3d 956, 959 (11th Cir. 1997) ("It is well established that land use rights, as property rights generally, are state-created rights.").

"Penn Central takings" claim (as opposed to simply considering whether the factual allegations tend to show that a property owner suffered an economic impact (without just compensation) as a result of a public action impacting the owner's property), the Court has reviewed D&D's Amended Complaint using the Penn Central factors as guideposts and finds that D&D has asserted sufficient factual allegations relating to each of those factors.

In consideration of the first Penn Station factor, the Court finds that D&D has sufficiently alleged that the at-issue regulation and governmental actions caused it to suffer an economic impact. D&D's Amended Complaint alleges that it purchased the at-issue parcels of property for specified prices (totaling just shy of $1 million). (See doc. 18, pp. 8–9, 11.) The Amended Complaint also asserts that "D&D, its bank, and its contractor had determined [that the planned development] . . . would yield a profit for D&D of millions of dollars," and that, "[h]ad [the property] been developed as planned, each of the five commercial and mixed-use building[s] planned for the development would have been worth more than $4,000,000.00 upon completion." (Id. at p. 25.) D&D alleges that Defendants' at-issue actions caused D&D "to lose approximately $7,000,000.00 in profits from post-construction equity in the Subject Property, leasing the commercial spaces, and selling the residential condominiums units."[5] (Id.; see also id. at p. 28.)

Concerning the second Penn Central factor, the Court finds that D&D has adequately alleged facts tending to show that the regulation has interfered with its distinct investment-backed expectations. D&D has alleged that it purchased the Subject Property in March 2016, (doc. 18,

---

[5] The Court observes that D&D has not asserted what it believes the fair market value of the property to be at this time (following and in light of the Defendants' at-issue actions), and further observes that D&D has stated only what it expected the *buildings* on the property (and not necessarily the property itself) to be worth (if constructed). Nonetheless, the Amended Complaint contains sufficient allegations for this claim to survive at the motion to dismiss stage, and the parties will be able to present specific evidence regarding the expected value versus the current value of the property at a later stage, when the Penn Central factors will actually be weighed and considered.

pp. 8–9), more than three years prior to the December 2019 Amendment to the MOD allowing for discretionary review by the Council, (id. at pp. 21).  D&D maintains throughout the Amended Complaint that it relied on the plain language of the MOD and the Code for C-1 zoning, together with representations by the City, to believe that its plans would be approved.  (Id. at p. 13.)

As to the third Penn Central factor, D&D, in its Amended Complaint, has adequately identified and described the character of the at-issue governmental action as "singl[ing] out" D&D. (Doc. 32, pp. 13–14; see doc. 18, pp. 28, 30.)  D&D has alleged that its site plans met all the appropriate criteria under the MOD and the Code for C-1 zoning, and that it had complied with each of the City's requests for the Subject Property's development.  (Doc. 18, pp 14–16, 18–19.) According to the Amended Complaint, after D&D had invested significant time and money, Defendants modified the relevant ordinance to give themselves discretion, which they did not initially have, in reviewing and approving projects in the at-issue area, in order to deny D&D's Remainder Site Plan.  Additionally, D&D alleges that Defendants denied D&D's Remainder Site Plan without providing supporting grounds for the exercise of Mayor and Council's discretion to deny the plan.  (Id. at pp. 22–23.)

The Court emphasizes that this "review" of the Penn Central factors has by no means involved any weighing of the strength of one party's case as compared to the others'.  Indeed, Defendants have not had the opportunity to present any substantive factual assertions of their own, and, at this early stage of the case, it would be inappropriate for the Court to consider anything other than the pleadings and exhibits thereto.  An analysis of the factors (and a determination of whether and how they support each party's case) will come at a later date—on summary judgment and/or at a trial.  See BVCV High Point, LLC v. City of Prattville, No. 2:21-cv-821, 2022 WL 3716592, at *11 (M.D. Ala. Aug. 29, 2022) ("The parties are not precluded from conducting

discovery on all three <u>Penn Central</u> factors, and they are free to reargue the <u>Penn Central</u> factors at summary judgment, in light of the evidence developed during discovery.").  That being said, taking into consideration the <u>Penn Central</u> factors, the Court finds that the Amended Complaint's factual allegations are sufficient to state a "<u>Penn Central</u> takings" claim.  Accordingly, Defendants' Motion to Dismiss D&D's takings claim (Count I) is **DENIED**.

## II.    Due Process Claim (Count II)

Defendants argue that D&D cannot maintain a substantive due process claim because the City's denial of D&D's permit was an executive act, and because the challenged ordinance itself is rationally related to a legitimate government interest.  (Doc. 21, pp. 13–18.)  According to Defendants, this precludes a substantive due process claim.  (<u>Id.</u>)  The Court agrees in part.

### A.    The Remainder Site Plan Denials are Executive Acts and Cannot Support a Substantive Due Process Claim

As a general rule, substantive due process takings claims cannot serve as independent causes of action and are instead to be analyzed solely under the Fifth Amendment.  <u>See</u> <u>Villas of Lake Jackson, Ltd. v. Leon Cnty.</u>, 121 F.3d 610, 612 (11th Cir. 1997) ("There is no independent 'substantive due process taking' cause of action.  The only substantive due process claim is for arbitrary and capricious conduct.").  However, an exception to the general rule exists "where a person's state-created rights are infringed by a 'legislative act.'" <u>Kentner v. City of Sanibel</u>, 750 F.3d 1274, 1279–80 (11th Cir. 2014).  "In that situation, the substantive component of the Due Process Clause applies to protect the property owner from 'arbitrary and irrational governmental action.'" <u>SP Frederica, LLC v. Glynn Cnty.</u>, 173 F. Supp. 3d 1362, 1379 (S.D. Ga. 2016).  While there is no specific test to determine what constitutes an executive versus a legislative act, the Eleventh Circuit has provided some guidance, noting that "executive acts typically arise from the ministerial or administrative activities of the executive branch and characteristically apply to a

limited number of people, often to only one." <u>Kentner</u>, 750 F.3d at 1280.  The Eleventh Circuit has specifically noted that this includes "individual acts of zoning enforcement." <u>Id.</u>  "Legislative acts, on the other hand, generally apply to a larger segment of—if not all of—society." <u>Id.</u>

According to the Amended Complaint, the City "infringed upon [D&D]'s property interest . . . when it twice denied D&D's . . . Remainder Site Plan."  (Doc. 18, p. 29.)  This part of Count II is clearly a challenge to the Council's "individual act[] of zoning enforcement" by specifically denying D&D's Remainder Site Plan under the 2019 Amendment.  <u>See</u> <u>Kentner</u>, 750 F.3d at 1280.  Each of the City's denials of the Remainder Site Plan thus constitutes an executive act.  <u>See</u> <u>SP Frederica</u>, 173 F. Supp. 3d at 1380 ("Defendants' denial of the[] permit application constituted an executive action, as it applied only to Plaintiffs and their Property, rather than the residents of [the] County at large.").  D&D provides no argument as to why the Council's denials should not be classified as executive acts or how it nevertheless could provide a basis for a substantive due process claim based on the denials.[6]  (<u>See generally</u> doc. 32.)  Accordingly, the Court finds that both denials of the site plan constituted executive acts which cannot support a substantive due process claim.  Thus, Defendants' Motion to Dismiss D&D's Substantive Due Process Claim, to the extent that it is based on the Council's denials of the Remainder Site Plan, is **GRANTED**.

---

[6]  Indeed, D&D does not even acknowledge this executive/legislative distinction in its Response.  (<u>See</u> doc. 32, pp. 15–16.)  This failure to respond arguably waives any opposition D&D has to Defendants' argument that the denial of the site plan was an executive act which cannot support a substantive due process claim. <u>See</u> <u>Zarate v. United States AG</u>, 307 F. App'x. 289, 290 (11th Cir. 2009) ("A party . . . waives an issue by failing to make any substantive arguments with respect to that issue."); <u>Hardy v. Ga. Dep't of Corr.</u>, No. 1:17-cv-172, 2019 WL 4670758, at *29 (S.D. Ga. Sept. 29, 2019) ("Plaintiff failed to respond to this argument in his response brief, arguably waiving any opposition to Defendants' argument.").  Defendants even re-raised this argument in their Reply, noting that "D&D . . . makes no effort to argue that the denial of the site plan amounted to a due-process violation."  (Doc. 33, p. 6.)  D&D then further neglected to respond to this point in its Sur-Reply.  (<u>See generally</u> doc. 36.)

**B.**   **D&D has Adequately Alleged that the 2019 Amendment was Unconstitutionally Vague**

While the Council's alleged votes to deny D&D's Remainder Site Plan were executive acts that cannot support a due process claim, D&D additionally challenges Council's passage of the ordinance (the Amendment to the MOD, which gave Council its discretion to deny the Plans) as a legislative act.  D&D submits that the 2019 Amendment to the MOD violates due process rights because it is "unconstitutionally vague and arbitrary," giving the City "unlimited power to enact regulations on an ad hoc basis," thereby depriving developers like D&D of their property interests by providing no notice as to what may be required of them to obtain approval for a site development plan.  (Doc. 18, p. 30; doc. 32, pp. 15–16.)  D&D specifically challenges the language in the 2019 Amendment that gives the City Council discretionary review of the proposed developments that "may pose an adverse effect on adjacent properties."  (Doc. 18, p. 19; doc. 32, p. 15.)  According to D&D, "adverse effect" is never defined, and there are no clear guidelines elsewhere in the ordinance concerning the application of this provision.  (Doc. 32, pp. 15–16.)  D&D asserts that the ordinance is vague because developers cannot predict what is required of them under the plain language and it thus allows for discriminatory and arbitrary enforcement by the reviewing council.  (See id. at p. 16 ("A developer seeking to know what might ultimately be required for a potential development within the MOD is left utterly clueless in the face of the . . . 2019 Amendment[.] . . . The language can be molded at will to require onerous and even preclusive limitations for arbitrary and discriminatory reasons.").)

A law can be impermissibly vague for either of two independent reasons: (1) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000); Harris v. Mexican Specialty Foods, Inc., 564 F.3d

1301, 1311 (11th Cir. 2009) (stating that a law is unconstitutionally vague "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case") (quoting Giaccio v. State of Pa., 382 U.S. 399, 402–03 (1966)).  Due process requires local ordinances to harbor a certain level of "precision and guidance" so that those enforcing the law do not act in an "arbitrary and discriminatory way."  Brantley Cnty., 559 F. Supp. 3d at 1376 (quoting FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012)); Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. 489, 498 (1982) ("A vague law impermissibly delegates basic policy matters . . . for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.").  However, as opposed to laws that implicate fundamental rights, "[s]tandard economic regulations, including zoning ordinances, need only pass 'a less strict vagueness test.'"  Burns v. Town of Palm Beach, 999 F.3d 1317, 1349 (11th Cir. 2021) (quoting Vill. of Hoffman Ests., 455 U.S. at 498).  Thus, an economic civil statute is unconstitutionally vague only if it is so indefinite as to "really . . . be no rule or standard at all."  Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1310 (11th Cir. 2009).  Nonetheless, even zoning ordinances cannot be so vague to allow those applying the ordinance to "make the law up as they go, based on wholly subjective judgments, such that [they] have unfettered discretion to label property a particular designation on an ad hoc basis."  Brantley Cnty., 559 F. Supp. 3d at 1377.

The parties have not directed the Court to any cases ruling on similar or analogous ordinances under a vagueness challenge on a motion to dismiss.[7]  (See generally docs. 21, 32, 33.)

---

[7] Defendants note that "D&D cites *no* cases . . . that ha[ve] upheld a void-for-vagueness challenge against a zoning ordinance merely because it allows for consideration of adverse effects on neighboring properties." (Doc. 33, pp. 7–8.)  Ironically, however, Defendants did not put forth any case law upholding an ordinance

Indeed, Defendants, for their part, seem to confuse the vagueness standard with a permissible purpose standard under a rational basis test.[8]  (See doc. 33, p. 8 (arguing that the ordinance passes the rational basis test because "courts have repeatedly confirmed that local governments *are* allowed to impose use restrictions that take into account the effects on nearby parcels").)  In their Reply, Defendants further reiterate that "courts have repeatedly confirmed that local governments are allowed to impose use restrictions that take into account the effects on nearby parcels."  (Doc. 33, pp. 7–8.)  However, this is not the relevant inquiry.  D&D is not challenging whether it would generally be within a government's power to regulate an adverse impact on the community; it is challenging the ordinance based on its theory that, *in application*, the ordinance provides no discernable standards for applicants to follow or for the board to apply, which results in the Council having unbridled discretion to deny site plans ad hoc.  (See doc. 33, pp. 15–16.)

Specifically, D&D alleges that the 2019 Amendment to the MOD lacks procedural safeguards to assist the Mayor and Council in discerning how to apply an "adverse effects" standard.  (Doc. 18, p. 19.)  The Amended Complaint specifically alleges that "[t]he standards applied by the Defendants to deny the Site Plan Application were not codified and did not exist anywhere in the ordinance."   (Id. at p. 29.)   According to D&D, it met all the necessary

---

that allows for discretionary review for adverse impacts in the face of a vagueness challenge.  (See generally id.)

[8]  Defendants additionally advance the argument that D&D cannot prevail on a substantive due process claim because the 2019 ordinance is "rationally related to a legitimate government interest."  (Doc. 21, pp. 16–18.)  While it is true that a challenge to a zoning ordinance which does not implicate fundamental rights should be reviewed under rational basis, D&D's challenge to the ordinance is that the language of the ordinance is unconstitutionally vague, not that the zoning restriction has "no substantial relation to the public health, safety, morals, or general welfare."  Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1374 (11th Cir. 1993).  Indeed, Plaintiff does not address this argument in its Response and instead focuses exclusively on its void for vagueness argument.  (See generally docs. 32, 36.)  Because rational basis review is not how a court analyzes a challenge for vagueness, the Court will not address these arguments raised in Defendants' Motion.

requirements under the MOD and the Code for C-1 zoning, it complied with all the requirements of the Site Plan Application, and it even obtained pre-approval from the Planning Commission. (Id. at pp. 22, 24.)  Thus, according to the Amended Complaint, the denial of the Remainder Site Plan was not based on any objective criteria, but simply the whims of the city counselors.  Taken together, the Court finds that D&D has sufficiently alleged a substantive due process void for vagueness claim.  Accordingly, Defendants Motion to Dismiss D&D's Substantive Due Process Claim (Count II), to the extent that it is based on the language of the ordinance, is **DENIED**.

### III.    D&D's Claims Against the Mayor and City Council Members

D&D originally had seven additional individual defendants listed in this case, sued "in their individual and official capacities."   (See doc. 1-1.)   Thereafter, the Court granted D&D's unopposed request to file an Amended Complaint which, *inter alia*, would "dismiss the individual defendants" named in the original Complaint.  (Doc. 17.)  In due course, D&D filed an Amended Complaint which deleted from the caption seven individually named defendants: Wall, Black, Williams, Higgins, Wilcher, and Hutcherson.  D&D also omitted from the caption the language indicating that all named defendants were being sued "in their [i]ndividual and official capacities." (Doc. 18, p. 1.)  However, D&D retained "the Mayor and Council" in the caption of the Amended Complaint.   (See id.)  Defendants note that D&D's inclusion of the Mayor and Council as a defendant suggests that D&D has reneged on its earlier representation that it would dismiss its claims against the individually named defendants.  Accordingly, Defendants argue that, to the extent that D&D is still pursuing claims against the Mayor and Council members[9] in either their

---

[9]    Defendants appear to interpret the Amended Complaint as asserting claims against the Council's individual members rather than the Council as a collective unit.  (Doc. 21, p. 19.)  There is support for this interpretation because D&D has also sued the City (of which the Council, as an official body, is a component), and the Amended Complaint alleges the Mayor and Council to be "residents of Pooler,"

official or individual capacities, those claims should be dismissed because "any official-capacity claims are redundant of the claims against the City," the Amended Complaint lacks any "factual allegations about any specific individual defendant," and because qualified immunity bars any individual-capacity claims asserted against them.  (Doc. 21, pp. 18–19.)

### A.     Any Official-Capacity Claims Against the Mayor or Council are Due to be Dismissed

"Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly."  Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991); Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Defendants are correct that because the City has been named in this case, official-capacity claims against the Mayor and/or the Council members are "redundant."  Busby, 931 F.2d at 776; Bloodworth v. Parker, No. 315-031, 2016 WL 723036, at *8 (S.D. Ga. Feb. 22, 2016).  Accordingly, to the extent that D&D still maintains official capacity claims against the Mayor and City Council members, the Court **GRANTS** Defendants' request for dismissal and those claims are hereby **DISMISSED**.

### B.     D&D's Claims Against the Mayor or Council in their Individual Capacities are Barred by Qualified Immunity

As for the claims against the Mayor and Council in their individual capacities, government officials engaging in discretionary functions additionally enjoy qualified immunity from suits for money damages in their individual capacities unless their actions violate "clearly established

---

suggesting they are named as individuals.  (Doc. 18, p. 2.)  Absent any response to Defendants' arguments on this point, the Court will construe D&D's claim to be against the Council's *members*.

statutory or constitutional rights of which a reasonable person would have known." Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007) (quoting Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003)). A government official who raises qualified immunity as an affirmative defense "must initially establish that he was acting within his discretionary authority." Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). If it is shown that the official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Id. at 1136–37. The alleged violations of the individuals here—presumably the Council and Mayor in enacting and enforcing the challenged legislation— were undoubtedly done within their discretionary authority. See, e.g., Frederica, 173 F. Supp. 3d at 1376 ("The members of the Board of Commissioners, in passing the zoning regulations at issue, were acting squarely within the realm of their legitimate job-related functions."). Accordingly, the burden shifts back to D&D to show a violation of clearly established law.

In its Response, D&D does not dispute—and indeed makes no mention of—Defendants' arguments concerning the individual defendants.[10] (See generally doc. 32.) Defendants then re-raised the issue in their Reply, (see doc. 33, pp. 8–9), and D&D again did not respond in its Sur-Reply, (see generally doc. 36). The Court has not found, and D&D has not provided, any authority to show denial of a permit amounts to a clearly established constitutional violation in this or a similar context. As D&D has not met its burden in plausibly alleging that the Mayor and Council violated clearly established law, the Court **GRANTS** Defendants' request and **DISMISSES** any

---

[10] The Court additionally notes that it would be entitled to dismiss the claims because of D&D's failure to respond to Defendants' opposition to the claims. Farr v. Hall Cnty., No. 2:11-CV-00074-RWS, 2011 WL 5921462, at *6 n.8 (N.D. Ga. Nov. 28, 2011) ("Plaintiff's failure to address the . . . argument asserted in [d]efendants' Motion . . . renders [those] claims as abandoned, and the [c]ourt would also be authorized to dismiss the claims on such grounds.").

and all claims asserted against the Mayor and Council members in their individual capacities on qualified immunity grounds.

## IV.   State Law Claims (Counts III and IV)

Finally, Defendants argue that D&D's state law claims (Counts III and IV) are due to be dismissed because D&D has failed to establish a vested property interest, because the individual defendants are entitled to official immunity, and because it has failed to allege a taking under the Georgia Constitution.  (Doc. 21, pp. 20–26.)[11]

### A.   D&D Has Adequately Pled a State Law Takings Claim (Count IV)

The Court first addresses Defendants' assertion that D&D's "takings claim under the Georgia Constitution must fail for the same reasons as the Fifth Amendment takings claim."  (Doc. 21, p. 3.)  In their Motion, Defendants do not raise a new argument under state law standards, and simply reiterate their federal takings argument, only citing one Georgia case stating that Georgia applies the same Fifth Amendment standards for takings.  (Id. at p. 23 (citing D. Rose, Inc. v. City of Atlanta, 859 S.E.2d 514, 515–16 (Ga. Ct. App. 2021)).

"Inverse condemnation claims draw their meaning and remedies from the eminent domain provisions in the Fifth Amendment of the United States Constitution and Article I, Section III, Paragraph I of the Georgia Constitution, each of which protects against uncompensated 'takings.'" D. Rose, Inc., 859 S.E.2d at 515–16.  Indeed, the Georgia Supreme Court has clarified that the same rules applied to Fifth Amendment takings—the per se takings rules and the Penn Central

---

[11]  While Defendants' initial brief sought dismissal of D&D's state law takings claim due to D&D's failure to comply with statutory ante litem notice requirements, (doc. 21, p. 20), Defendants withdrew that ground in their Reply brief, (doc. 33, p. 2).  Indeed, the Georgia Supreme Court has clarified that ante litem notice is not required for claims other than for negligent injury to person or property.  See West v. City of Albany, 797 S.E.2d 809, 812 n.8 (Ga. 2017) ("To the extent any Georgia Court of Appeals opinions hold that the municipal ante litem notice statute applies to claims other than negligence claims, they are overruled.").

analysis described in Discussion Section I, <u>supra</u>—apply with equal force to takings claims brought under the Georgia Constitution.  See <u>Diversified Holdings, LLP v. City of Suwanee</u>, 807 S.E.2d 876, 885–86 (Ga. 2017); <u>Mann v. Georgia Dep't of Corr.</u>, 653 S.E.2d 740, 743 (Ga. 2007) (applying the "ad hoc, factual inquiries set forth in <u>Penn Central</u>" to determine whether a Georgia law was an impermissible regulatory taking) (internal quotations omitted).  Thus, for the same reasons the Court has found that Plaintiff's Fifth Amendment takings claims survive, <u>see</u> Discussion Section I, <u>supra</u>, the Court likewise finds that D&D has adequately alleged a taking under Georgia law.  Accordingly, Defendants' Motion to Dismiss D&D's takings claim under the Georgia Constitution (Count IV) is **DENIED**.

> **B.    D&D Has Adequately Pled that it was Deprived of a Vested Property Interest (Count III)**

Defendants next argue that D&D's state law claims are due to be dismissed because "D&D has still not pleaded sufficient facts to establish a 'vested right' under Georgia law."  (Doc. 21, p. 21.)  According to Defendants, D&D cannot show that it had a vested property right because its allegations do not indicate that it "receive[d] any official assurance that the proposed development would be allowed."  (<u>Id.</u> at p. 22.)  The Court disagrees.

Under Georgia law, "[w]here a landowner makes a substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, *based upon an existing zoning ordinance and the assurances of zoning officials*, he acquires vested rights and is entitled to have the permit issued."  <u>Barker v. Forsyth Cnty.</u>, 281 S.E.2d 549, 552 (Ga. 1981) (emphasis added).  Georgia's vested rights doctrine is derived from the principle of equitable estoppel and takes the position that "the expenses involved would not ordinarily have been incurred if a landowner had not reasonably assumed that . . . the building permits . . . , in all reasonable probability, would issue."  <u>Cohn Cmtys., Inc. v. Clayton Cnty.</u>, 359 S.E.2d 887, 889

(Ga. 1987).  The Supreme Court of Georgia has made clear that, in order to acquire a vested right based on an assurance, a landowner must show, *inter alia*, its "reliance upon *the probability* of the issuance of a building permit," meaning there was a representation that a building permit *will likely issue* in the future.  Brown v. Carson, 872 S.E.2d 695, 698 (Ga. 2022).

In Cohn, the Georgia Supreme Court held that a letter from the county planner "stating the present zoning of the tract in question" did not qualify as the type of assurance necessary to obtain a vested right.  359 S.E.2d at 359.  Likewise, in Brown, the Georgia Supreme Court found that merely meeting with the county planning director to discuss the current zoning ordinance did not amount to an "assurance . . . that a building permit would probably issue or that the county would not change the property's zoning."  872 S.E.2d at 698.  In both cases, the court found this to be "no more than a neutral statement of the present zoning in effect, a fact the landowner could easily obtain himself by consulting the proper records."  Cohn, 359 S.E.2d at 889; Carson, 872 S.E.2d at 698.

D&D has alleged far more than a mere statement that the Remainder Site Plan complied with the zoning ordinance in place.  The Amended Complaint specifically alleges that "D&D relied on the plain language of the MOD and the Code for C-1 zoning, *along with the City's assurances* that: (1) the Proposed Concept was permitted on the Subject Property subject to the design standards of the MOD and Code for C-1 zoning; and (2) no discretionary review would be triggered unless D&D asked for a variance."  (Doc. 18, p. 13 (emphasis added).)  The Amended Complaint alleges that it was the City that encouraged D&D to develop its Site Plan.  (Id. at p. 3); see WMM Props., Inc. v. Cobb Cnty., 339 S.E.2d 252, 255 (Ga. 1986) (finding relevant that the county commission chairman, "who was well aware of [the developer's] plans, solicited the company to purchase the property in the first place").  D&D alleges that it "repeatedly" received assurances

25

from City officials and staff "that the Proposed Concept was 'what we [(the City)] want' during their pre-submittal consultations in 2018." (Doc. 18, p. 13.)  The City instructed D&D to develop the project in one site development application as opposed to the phased process D&D was planning to utilize.  (Id. at p. 14.)  D&D even alleges that the City suggested purchasing additional land for parking in order to avoid having to ask for a parking variance—which would trigger discretionary review—causing D&D to purchase an additional lot.  (Id. at pp. 13–14.); see Spalding Cnty. v. E. Enters., 209 S.E.2d 215, 216 (Ga. 1974) (buying property because of the county commissioner's assurances it could be used for the developers' intended purpose).

Moreover, D&D actually submitted its Site Plan application (which included the OSC Site Plan together with the Remainder Site Plan) in December 2018, before the 2019 Amendment allowing for discretionary review was adopted. (Doc. 18, p. 14.) D&D received routine comments from the City and prepared its revised plans at the City's instruction.  (Id. at pp. 17–19.)  In preparing the revised plan, the Amended Complaint alleges that the City instructed D&D to first submit the OSC Site Plan, "*so that it could be approved separately*."  (Id. at p. 18 (emphasis added).)  Additionally, the Amended Complaint alleges that the City instructed D&D to wait to submit the Remainder Site Plan until after the City's elections, specifically alleging that "[t]he City's representatives indicated [that] if D&D would stage the development in this manner, the remaining portion of the site plan would be approved by City Council after the election." (Id. pp. 18–19.)

Taking the facts as alleged in the Amended Complaint as true and construing them in D&D's favor, D&D has alleged that site plans were developed in close consultation with the City, that the City instructed and assured D&D that, so long as it did certain things, it would be in compliance with the applicable ordinances and would receive approval, and that D&D modified

much of its proposed development of the Subject Property at the City's direction.  See Barker, 281 S.E.2d at 550–51, 552 (purported assurances that a "project would be permissible under existing agricultural zoning as a commercial recreation use if certain modifications were made" could give rise to vested rights).  Accordingly, the Court finds that D&D has adequately alleged a vested right claim under Georgia law (Count IV), and Defendants' Motion to Dismiss that claim is **DENIED**.

## V.       Abstention

Alternatively, Defendants argue that this Court should abstain from exercising its jurisdiction pending the resolution of the state-court appeal pursuant to Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941).  (Doc. 21, pp. 26–29.)[12]  "Pullman-type abstention is a narrow, judicially created exception to the general grant of federal jurisdiction."  BT Inv. Managers, Inc. v. Lewis, 559 F.2d 950, 953 (5th Cir. 1977).  The "Pullman Doctrine" holds that "[a] federal action may be stayed pending state proceedings in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law."  Nasser v. City of Homewood, 671 F.2d 432, 439 (11th Cir. 1982) (internal quotation omitted).

Pullman abstention applies only in cases raising constitutional challenges, and then only when: "(1) the case [also] presents an unsettled question of state law, and (2) the question of state law is dispositive of the case or would avoid, or substantially modify, the constitutional question presented."  Rindley v. Gallagher, 929 F.2d 1552, 1554–55 (11th Cir. 1991).  "An uncertain question of state law is critical to the decision to abstain."  Duke v. James, 713 F.2d 1506, 1510

---

[12]  Defendants also vaguely contend that abstention would be appropriate under Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976).  (Doc. 21, p. 28 n.5.)  However, they fail to explain why Colorado River abstention would be appropriate.  Accordingly, the Court declines to address this argument.

(11th Cir. 1983). "The issues of state law must be substantially uncertain or ambiguous, necessitating a construction by the state supreme court." Nasser, 671 F.2d at 439. The Eleventh Circuit has additionally held that "if the state court will merely apply federal constitutional law, then the state construction will *not* moot or modify the constitutional question." Duke, 713 F.2d at 1510; see also Haw. Housing Auth. v. Midkiff, 467 U.S. 229, 237 n.4 (1984) (declining to abstain in a takings case where the state law challenge was parallel to the constitutional challenge).

The Court finds that Defendants have failed to show an unsettled issue under Georgia law requiring abstention. See Nasser, 671 F.2d at 439 (finding Pullman abstention inappropriate where defendants failed to identify any unsettled issue of Alabama law). D&D's claims are primarily argued under federal law through its Fifth Amendment takings claim and Fourteenth Amendment Substantive Due Process Claim. As discussed in Section IV.A, supra, Georgia takings jurisprudence is identical to the federal standard and likewise does not present any "unsettled" question of state law. See Carroll v. City of Prattville, 653 F. Supp. 933, 938–40 (M.D. Ala. 1987) (finding Pullman abstention was not required where the challenged zoning ordinance was argued under Alabama's due process clause which afforded the same degree of protection as the Fourteenth Amendment); Duke, 713 F.2d at 1511 (finding the state law and federal law to be consistent and concluding that "[the challenged ordinance] is not fairly subject to a state law construction that would avoid or substantially modify the federal constitutional question").

In their Motion, Defendants do not provide the Court with an argument as to how this case invokes uncertain questions of state law, but merely hang their hat on the pending appeal in the state superior court. (See doc. 21, pp. 26–28.) Indeed, Defendants are not arguing that an interpretation of state law would moot the federal question, but rather that the state court's interpretation of *federal* law may potentially moot this lawsuit. That is not what Pullman requires.

<u>Pullman</u> requires that the interpretation of some statute or law would be *fairly subject* to a state law construction that would avoid or substantially modify the federal constitutional question. <u>Duke</u>, 713 F.2d at 1510. "Abstention should not be used as a lever to force the state courts to do the federal courts' work. . . .  A federal court must grapple with difficult constitutional questions that confront it squarely."  <u>Id.</u>  Simply because the state court may or may not come to some different conclusion in its interpretation of federal law does not warrant abstention.  Additionally, it is unclear what law the state court will even be applying.  All that is known to the Court at this stage is that an appeal of the denial of the Remainder Site Plan pending in Superior Court.  (Doc. 18, p. 26.)  Without more information regarding this proceeding, it is impossible for the Court to determine what laws the state Court would even be applying.

Moreover, D&D notes that its "action in Superior Court has been pending for over two years with little movement." (Doc. 32, p. 17.)  While "the existence of a pending state court action that may resolve the issue" is a factor that weighs in favor of abstention, "the fact that the case has already been in litigation for a long time" weighs *against* abstention.  <u>Duke</u>, 713 F.2d at 1510. D&D has alleged mounting financial loss from its continuing inability to develop the property. The fact that the state court action has been pending for two years without resolution does not give this Court assurance that it can "secure an expeditious answer" in the resolution of the state law proceedings.  <u>Duke</u>, 713 F.2d at 1510; <u>see, e.g.</u>, <u>Afran v. McGreevey</u>, 115 F. App'x 539, 543 (3d Cir. 2004) (time sensitive nature of the issue at hand made abstention inappropriate even if the defendants had made a proper showing that <u>Pullman</u> should apply).  Accordingly, the fact that an appeal of the Remainder Site Plan's denial is pending in the Superior Court does not, on the facts presently before the Court, warrant abstention in this case.   Accordingly, Defendants' alternative request that the Court stay this action is **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss.  (Doc. 21.)  The Court finds that the Amended Complaint plausibly alleges a "Penn Central taking" claim, and accordingly, Defendants' requests that the Court dismiss D&D's Fifth Amendment claim (Count I) and its state law just compensation claim (Count IV) are both **DENIED**.  Additionally, the Court finds that D&D has adequately alleged that the challenged ordinance was void for vagueness, and accordingly Defendants' request for dismissal of D&D's Substantive Due Process Claim (Count II) is likewise **DENIED**.[13]  The Court additionally finds that D&D has adequately alleged a vested right, and thus **DENIES** Defendants' request for dismissal of D&D's Infringement of Vested Property Rights Claim (Count III).  However, the Court finds the claims brought against the Mayor and City Council members, in either their official or individual capacities, are subject to dismissal and therefore **GRANTS** Defendants' Motion to Dismiss with respect to those claims.  The Court additionally **DENIES** D&D's Request for Oral Argument on the Motion.  (Doc. 35.)

---

[13]  However, to the extent Plaintiff seeks to challenge the executive acts of the Council in denying the Remainder Site Plan under substantive due process, Defendants' request for dismissal is **GRANTED**.

Accordingly, the Court **DIRECTS** the Clerk of Court to **TERMINATE** the Mayor and Council of the City of Pooler, as well as any individuals currently listed on the docket,[14] and to **LIFT** the stay of discovery that is currently in place.  The remaining parties are **ORDERED** to confer and submit a Rule 26(f) Report no later than **fourteen (14) days** from the date of this Order.

**SO ORDERED**, this 18th day of September, 2023.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[14] The City of Pooler is now the sole remaining Defendant in this case.