**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| DAWGS & DINGOES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF POOLER, GEORGIA,<br><br>Defendant. | CIVIL ACTION NO.: 4:22-cv-176 |

# ORDER

Plaintiff Dawgs & Dingoes, LLC's ("D&D") sued Defendant, the City of Pooler (the "City"), pursuant to the Fifth and Fourteenth Amendments following the City Council's denial of D&D's application for a proposed multi-use development in the City. (Doc. 18.) D&D generally alleges that the denial of the site plan application constituted an unlawful regulatory taking and violated its rights under the federal and Georgia constitutions. (Id.) Before the Court is the City's Motion for Summary Judgment, (doc. 86), and D&D's Motion for Summary Judgment, (doc. 100). The motions have been fully briefed. (Docs. 86-1, 100, 120, 126, 129 & 134.) For the reasons below, the Court **GRANTS** the City's Motion for Summary Judgment, (doc. 86), and **DENIES** D&D's Motion for Summary Judgment, (doc. 100).[1]

[1] Also before the Court is the City's Appeal of the Magistrate Judge's Order Denying Defendant's Motion to Exclude Expert Testimony. (Doc. 136; see doc. 135.) Because the Court grants the City's Motion for Summary Judgment as to D&D's takings claims on ripeness grounds, the Court **DENIES as moot** the City's Appeal. (Doc. 136.)

## BACKGROUND

### I. Factual Background

#### A. D&D's Acquisition of the Property and the Establishment of the Overlay District

D&D is a limited liability company, formed and owned by Dr. Nicholas Theodotou and Debra Theodotou, husband and wife. (Doc. 100-1, p. 1; doc. 120-1, pp. 1–2; doc. 134-1, p. 1.) Dr. Theodotou is an oral and maxillofacial surgeon and prosthodontist who, before the creation of D&D, already had an oral surgery practice within the City. (Doc. 100-1, p. 1; doc. 120-1, p. 2; doc. 134-1, p. 2.) The Theodotous created D&D to buy and own real estate, including the property where the oral surgery practice was located. (Doc. 134-1, p. 2.) D&D owned approximately 4.39 acres of commercially zoned real property located in the City (the "Subject Property"). (Doc. 100-1, p. 1; doc. 120-1, p. 2.) The Subject Property is made up of five contiguous parcels of land: tax parcel 50008 03001 (the "First Parcel") (Nicholas Theodotou, DDS, P.C. ("Theodotou P.C."), another entity that the Theodotous owned, purchased this parcel in March 2016 and quitclaimed it to D&D in October 2019); tax parcels 50008 03014, 50008 03016, and 50008 03017 (D&D purchased these parcels in November 2016); and tax parcel 50008 03015 (D&D purchased this parcel in September 2018). (Doc. 100-1, pp. 1, 5; doc. 120-1, pp. 1–2, 6; see doc. 18, pp. 8–9.) The Subject Property is zoned "C-1, Commercial, light district." (Doc. 100-1, p. 1; doc. 120-1, p. 2; see doc. 100-9.)

In April 2015, the City announced its plan to build a new municipal complex in the "Main Street Corridor" area of the City to help spur new mixed-use and commercial development in the area. (Doc. 100-1, p. 2; doc. 120-1, p. 2.) In 2016, in furtherance of its plan to revitalize the Main Street Corridor, the City adopted an updated Comprehensive Plan that included as a short-term

goal the adoption of an overlay district called the Main Street Overlay District ("MOD"). (Doc. 100-1, p. 4; doc. 120-1, p. 2; see doc. 100-8.) The City adopted the MOD in 2017, and it includes a provision allowing for "mixed use" and "upper story residential" uses alongside commercial uses on the ground floor. (Doc. 100-1, p. 4; doc. 120-1, p. 2; see doc. 100-10, pp. 2–3 (2017 MOD Ordinance).) The Subject Property is located within the MOD. (Doc. 100-1, p. 1; doc. 120-1, p. 2.)

### B. D&D's Meetings with the City as to Potential Development

In 2018, D&D consulted architect Scott Barnard to assist in the design of its proposed project known as the Pooler Promenade Development ("Pooler Promenade"), a multi-building, mixed-use commercial development consisting of, among other things, a two-story building housing an oral surgery center and offices. (Doc. 100-1, pp. 6–7; doc. 120-1, pp. 6–7.) Barnard also sought guidance from City officials on D&D's behalf about permitted uses of the Subject Property within the MOD and whether the City had any preferences for what would be developed on the Subject Property. (Doc. 100-1, p. 6; doc. 120-1, p. 6.)

D&D claims that it discussed the specifics of the Pooler Promenade proposal with the City in March 2018. (Doc. 100-1, pp. 6–7; doc. 120-1, pp. 6–7.) The City claims that "[r]ather than presenting any concrete proposals, [D&D] merely showed photographs of a mixed-use project from Beaufort, South Carolina." (Doc. 120-1, pp. 6–7.) The City "generally admit[s]," though, that in the March 2018 meeting, then-City manager Robbie Byrd, then-zoning administrator Kim Classen, and assistant City manager Matt Saxon expressed enthusiasm for the Pooler Promenade project and recommended that D&D hire an engineer to help create the site plans (which were ultimately submitted for Site Plan approval in December 2018). (Doc. 100-1, p. 7; doc. 120-1, p. 7.) Accordingly, in April 2018, D&D hired Coastal Civil Engineering. (Doc. 134-1, p. 6.) D&D

later engaged in multiple consultations with the City throughout 2018 concerning the development of its plans for the Subject Property and to ensure the project met the requirements of the City's ordinances. (Doc. 100-1, pp. 6–7; doc. 120-1, pp. 6–7.) Mrs. Theodotou testified during her deposition on behalf of D&D that, in May 2018, D&D and their engineer met with City staff and presented "an initial little sketch" of what the project would look like. (Doc. 134-1, pp. 6–7; see doc. 134, p. 12.) Later in May 2018, D&D met with the City's fire marshal and code-enforcement officer. (Doc. 134-1, p. 9.) Mrs. Theodotou testified that at that point, there were no "architectural renderings or anything," and there were no discussions as to "zoning requirements [or] site plan requirements" at the meeting. (Id. at pp. 9–10.) Following the second May meeting, D&D and the City met in June 2018 "to discuss details and potential issues . . . for [the] initial '3-phase concept plan.'" (Id. at pp. 10–11.) D&D also purchased another parcel because the City informed D&D that additional parking was necessary to avoid seeking a variance from parking requirements. (Doc. 100-1, p. 8; doc. 120-1, p. 8.)

**C. Submission and Withdrawal of the 2018 Site Plan**

In December 2018, D&D formally submitted its application for Site Plan Approval for the Pooler Promenade project along with the required set of site plans and supporting documentation and without a request for a variance, (the "2018 Site Plan"), to the City. (Doc. 100-1, p. 8; doc. 120-1, p. 8; doc. 134-1, p. 13.) D&D initially intended to submit three separate site plan applications with three sets of site plans—including one for just the oral surgery center ("OSC")—to pursue the approval of the project in three phases. (Doc. 100-1, p. 8; doc. 120-1, p. 8.) Upon the City Manager's urging, however, D&D instead combined the plans and submitted them under one site plan application for the entire project. (Doc. 100-1, p. 8; doc. 120-1, p. 8.) The 2018 Site Plan consisted of parcels that D&D owned, and the First Parcel, which Theodotou P.C. still owned.

(Doc. 100-1, pp. 5–6; doc. 120-1, p. 6.) The 2018 Site Plan included four three-story mixed-use buildings, a separate two-story office building, and a new oral-surgery center to replace the one in which Dr. Theodotou was then practicing. (Doc. 134-1, p. 14.)

The City hired third-party engineering firm Integrated Science and Engineering, Inc. ("ISE") to review the 2018 Site Plan application. (Doc. 100-1, p. 11; doc. 120-1, p. 12; doc. 100-94.) ISE was responsible for reviewing the site plans for compliance with the applicable zoning requirements and providing the City with comments if its review indicated any portion of the site plan failed to meet said requirements. (Doc. 100-1, p. 11; doc. 120-1, p. 12.) ISE also reviewed the site plans for compliance with applicable sections of state and local site engineering regulations like stormwater management, building codes (insofar as they applied to site development), and land disturbing activity regulations ("Non-zoning Site Engineering Requirements"). (Doc. 100-1, pp. 11–12; doc. 120-1, p. 12.) In addition to ISE, City staff reviewed the site plans for compliance with the state and local regulations administered by their respective departments, which included Public Works, Water, Streets, and Stormwater, and staff provided comments based on their review to ISE, which coordinated the entire review process for the City. (Doc. 100-1, p. 12; doc. 120-1, p. 12.)

On January 15, 2019, ISE issued a letter to Kim Classen, the City's Zoning Administrator, providing comments based on its "general review in accordance with local ordinances and guidelines," along with the comments provided by the City's reviewing departments. (Doc. 100-1, p. 12; doc. 120-1, p. 12; doc. 100-95.) Classen (or someone designated by her) provided ISE's comments to D&D's civil engineer, Coastal Civil Engineering, who addressed the comments by revising the site plans. (Doc. 100-1, p. 12; doc. 120-1, p. 12; doc. 100-97.) On February 20, 2019, Classen emailed ISE to ensure that ISE knew that its review of the site plans was subject to the

requirements of the 2017 MOD, and Classen provided a link to that section of the zoning ordinance. (Doc. 100-1, p. 12; doc. 120-1, p. 12; doc. 100-96.) ISE responded to Classen's email on the same day by noting that comments related to the landscape buffer and the "landscape plan/preferred trees" would need to be modified, and maybe one additional comment would be needed, but otherwise there "[d]oesn't appear to be anything major" implicated by the project being in the MOD. (Doc. 100-1, pp. 12–13; doc. 120-1, p. 13.)

Upon receipt of the details of the proposed Pooler Promenade development, residents who lived nearby began calling and e-mailing City Council members and staff to express their opposition to the project. (Doc. 100-1, p. 13; doc. 120-1, p. 13.) On March 23, 2019, Mrs. Theodotou asked City Manager Byrd whether D&D should meet with the mayor to discuss a proposed buyout, in light of the residents' opposition and the 2019 City Council election to be held in November. (Doc. 100-1, p. 13; doc. 120-1, p. 13; doc. 100-24.) Mr. Byrd encouraged D&D to meet with the mayor to discuss the mayor's concerns and expressed his hope that "once [the mayor] sees the plans [he] will be more accepting." (Doc. 100-1, p. 14; doc. 120-1, p. 14; doc. 100-24.)

On March 29, 2019, Coastal Civil Engineering resubmitted an updated 2018 Site Plan that addressed all of ISE's comments. (Doc. 100-1, p. 14; doc. 120-1, p. 14; doc. 100-98.) On April 9, 2019, ISE issued a "Clean Letter" for the revised 2018 Site Plan via email sent to Zoning Administrator Classen. (Doc. 100-1, p. 14; doc. 120-1, p. 14; doc. 100-99.) The April 2019 Clean Letter indicated ISE had reviewed the 2018 Site Plan, determined that they complied with the Applicable Zoning Requirements and Non-zoning Site Engineering Requirements, and recommended the City therefore approve D&D's site plan application. (Doc. 100-1, p. 14; doc. 120-1, p. 15; doc. 100-99.) On April 12, 2019, Classen emailed the engineer hired by the City to review the plan, explaining that "[t]his [plan] was already reviewed and a clean letter was received,

however [D&D has] not purchased the front property on the right looking from W. Highway 80. Therefore, I have asked the engineer to send . . . the revisions to me electronically for your review." (Doc. 100-100, p. 2.)

At that time, the 2018 Site Plan was scheduled to be heard by the Planning Commission in April 2019. (Doc. 134-1, p. 18.) More than once, Byrd encouraged D&D to separate the OSC and push it through first, and to hold back the rest of the project until after the election. (Doc. 100-1, p. 15; doc. 120-1, p. 16.) Byrd recognized that it was an election year, and D&D had "a heck of a lot better chance on getting [the project] approved after the election than [they did] before the election." (Doc. 100-1, p. 15; doc. 120-1, p. 16; doc. 100-39, p. 6.) Byrd wanted D&D to move forward with the OSC so that the quality of the project could be seen by Council. (Doc. 100-1, p. 15; doc. 120-1, p. 16; doc. 100-39, p. 6.)

Per Byrd's recommendation, D&D met with Mayor Lamb in April 2019. (Doc. 100-1, p. 15; doc. 120-1, p. 16; doc. 100-51, p. 39.) At that time, D&D was unaware that ISE had issued the April 2019 Clean Letter. (Doc. 100-1, p. 15; doc. 120-1, p. 16; doc. 100-51, p. 39.) During the meeting, Mayor Lamb expressed his concern about the neighbors' opposition to the Pooler Promenade project. (Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-51, p. 39.) D&D emphasized the need to begin construction on the OSC, pointing to the deteriorating condition of the building Dr. Theodotou's practice was operating out of at the time. (Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-51, p. 39.) The City opined that the OSC would likely be approved more quickly if it separated the remaining portion of the Pooler Promenade project, and the remaining portion may have a better chance of approval following the city council elections that would occur in November 2019. (Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-51, pp. 39–40.) D&D then separated the OSC from the remaining portion of the Pooler Promenade project for permitting purposes. (Doc.

100-1, p. 16; doc. 120-1, p. 16; doc. 100-51, p. 40.) Byrd and Mrs. Theodotou agreed to the removal of the 2018 Site Plan Application from the upcoming Planning and Zoning meeting to be held on April 22, 2019. (Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-25; doc. 100-26.)

**D. Approval of the OSC Site Plan and the City's MOD Amendment**

On May 20, 2019, the City adopted an amendment to add the following language to the MOD:

> In fulfilling the purpose and intent of the overlay district, Mayor and Council shall consider the effect of this Ordinance on properties which are adjacent to the overlay district in all decisions. Where development within the overlay district may pose an adverse effect on adjacent properties, Mayor and Council may place additional requirements, including without limitation, design standards, height requirements, architectural design standards, types of materials, etc., on projects in the Overlay District.

(the "May 2019 MOD Amendment"). (Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-15, p. 2.) D&D asserts that "the plain language of the Amended MOD purportedly gives the City discretion to deny site plan applications within the Overlay District," while the original MOD did not bestow such discretion. (Doc. 100-1, p. 17). But the City counters that the "original version of the ordinances already gave Council discretion." (Doc. 120-1, p. 17).

After Mrs. Theodotou learned of the May 2019 MOD amendment, she emailed Byrd to ask if the adoption of the amendment meant that the project was "sunk." (Doc. 100-1, p. 18; doc. 120-1, p. 18; doc. 100-28.) Byrd responded "[n]o," and added that in his opinion, the amendment was passed "to placate residents." (Doc. 100-1, p. 18; doc. 120-1, p. 18; doc. 100-28.) He added that "Council asked attorney to amend the ordinance to cover adjacent property owners. City [C]ouncil has full authority to approve or deny based off their concerns without this amendment. I think we move forward just as planned with [OSC] first. Then after election with [R]emainder [Site Plan]." (Doc. 100-1, p. 18; doc. 120-1, p. 18; doc. 100-28.)

In July 2019, the City further revised its ordinances by also amending the ordinance section governing the approval of site plans (the "July 2019 Site Plan Approval Amendment"). (Doc. 134-1, pp. 24–25.) That ordinance generally provides that applications for site plan approvals are required to be reviewed by staff, then the City Engineer, and then the Planning Commission. (Id. at p. 25.) Following the Planning Commission review, site-plan applications then go to the City Council for final approval or denial. (Id.) The July 2019 Site Plan Approval Amendment provides that:

> In order to promote the public health, safety, and general welfare of the City of Pooler against the unrestricted development upon property, the following standards and any other factors relevant to balancing the above stated public interest will be considered, when deemed appropriate, by City Council in approving any site plan[.]

(Doc. 100-12, p. 3.) The ordinance then sets forth ten criteria for the City Council to consider when deciding whether to approve a site plan. (Doc. 100-1, p. 18; doc. 120-1, p. 18; doc. 134-1, pp. 25–26; doc. 100-12; doc. 100-13.)

Following D&D's meeting with Mayor Lamb in April 2019, D&D's engineer set to work on a new site plan for only the OSC (the "OSC Site Plan"). (Doc. 134-1, p. 22.) D&D then applied for approval of the OSC Site Plan, which the City approved in fairly short order. (Id.) D&D later broke ground on that construction in September or October 2019. (Id. at p. 23.)

**E. Submission and Denial of the Remainder Site Plan**

D&D then began moving to have the City consider a proposed site plan for the remainder of the property (the "Remainder Site Plan"). (Doc. 134-1, p. 27.) Coastal Civil Engineering submitted the Remainder Site Plan for approval in November 2019. (Doc. 100-1, p. 18; doc. 120-1, p. 18.) ISE reviewed the Remainder Site Plan and issued a clean letter on December 11, 2019. (Doc. 100-1, p. 19; doc. 120-1, p. 18; doc. 100-101.) The Remainder Site Plan was before the

Council for approval during its December 16, 2019, meeting. (Doc. 100-1, p. 19; doc. 120-1, p. 18; doc. 100-38.) Before hearing from D&D's representatives, one Council member made a motion to deny the Remainder Site Plan stating that it would adversely affect the neighborhood and it is also a public safety concern. (Doc. 100-1, p. 19; doc. 120-1, p. 18; doc. 100-38.) The City Council denied the Remainder Site Plan. (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-38.)

On January 25, 2020, D&D appealed the City Council's denial to the Superior Court of Chatham County, Georgia. (Doc. 18, p. 23.) On June 12, 2020, D&D voluntarily dismissed that action in exchange for the City Council's agreement to reconsider the Remainder Site Plan. (Id.) In June 2020, D&D re-submitted the Remainder Site Plan application, which was materially identical to the application D&D had submitted in November 2019 (which was denied in December 2019). (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-43, pp. 10–11.) On reconsideration, the Planning Commission recommended that the plan be approved; however, the City Council denied the Remainder Site Plan on August 3, 2020. (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-43, p. 11.) In September 2020, D&D again appealed the denial of the Remainder Site Plan to the Superior Court of Chatham County. (Id. at p. 26.) It appears the Superior Court dismissed the appeal on April 17, 2026.

## II. Procedural History

On December 16, 2021, D&D filed this separate action in the Superior Court of Chatham County, challenging the denial of the Remainder Site Plan and the May 2019 MOD Amendment. (Doc. 18; doc. 1-1.) The original Complaint named as defendants, in addition to the City, these persons in their individual and official capacities: the Mayor and Council; Rebecca Benton; Stevie Wall; Shannon Black; Karen Williams; Aaron Higgins; John Wilcher; and Tom Hutcherson. (Doc. 1-1, p. 2.)

Defendants removed the case to this Court on July 21, 2022. (Doc. 1.) Following Defendants' filing of a Motion to Dismiss, D&D sought and was granted leave to file an Amended Complaint, dropping the individually named Defendants. (See doc. 18.) The Amended Complaint lists only the City and the Mayor and Council as defendants and omits the seven individually named persons. (Id. at p. 1.)

In the Amended Complaint, D&D alleges just compensation claims under both the Fifth Amendment (Count I) and Georgia law (Count IV), a substantive due process claim under the Fifth and Fourteenth Amendments (Count II), and a claim for infringement of vested property rights under Georgia law (Count III). (Id. at pp. 27–31.) Defendants then filed an updated Motion to Dismiss in which they moved to dismiss all of D&D's claims. (Doc. 21.) Following the Court's ruling on the Motion to Dismiss, the City is the sole remaining Defendant, and the claims that remain are: D&D's takings claim (Count I); D&D's Substantive Due Process Claim, but only to the extent that it is based on the language of the ordinance (Count II); D&D's claim for infringement of vested property rights (Count III); and D&D's takings claim under the Georgia Constitution (Count IV). (See generally doc. 45.)

Both parties have moved for summary judgment in their respective favors.[2] (Doc. 86; doc. 100.) D&D moves for summary judgment on all of its claims, arguing that the City "lacked discretion to deny D&D's Site Plan Application, which constituted a taking and a violation of D&D's due process rights," and the City "cannot show that any facts would defeat D&D's Motion for Summary Judgment." (Doc. 100, p. 15.) The City moves for summary judgment on all of

[2] D&D originally moved for summary judgment, (doc. 92), but later moved to amend its motion, (doc. 97). The Court granted D&D leave to file an Amended Motion for Summary Judgment, (doc. 98), which D&D then filed, (doc. 100). D&D also filed a Motion to Withdraw its Original Motion for Summary Judgment, (doc. 92), which the Court granted, (doc. 103).

D&D's remaining claims for six reasons: (1) D&D's regulatory takings claims must fail because it has failed to prove an economic impact sufficient to establish such a claim and has likewise failed to sufficiently prove an investment-backed expectation; (2) D&D's takings claim must fail because D&D never pursued any less intensive, alternative development of the Subject Property, and this claim is therefore not ripe; (3) the relevant City ordinances are not so unconstitutionally vague as to rise to the level of a substantive due process violation; (4) D&D's claim for violation of its alleged vested rights to develop the property is barred by sovereign immunity; (5) even if sovereign immunity did not bar the vested rights claim, D&D has failed to prove the necessary elements for such a claim; and (6) D&D's state law takings claim must fail for the same reasons as the federal takings claim. (doc. 86-1, pp. 2–3.) The motions have been fully briefed. (Docs. 86-1, 100, 120, 126, 129 & 134.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any

material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I. Fifth Amendment Takings Claim (Count I)

#### A. Regulatory Takings Law

D&D brings suit pursuant to 42 U.S.C. § 1983 for violation of its Fifth Amendment rights. (Doc. 18, pp. 27–28.) D&D alleges that "[t]he City's denials of [its] Site Plan Application and

[the City's] 2019 revisions of the . . . MOD, separately and collectively, constituted an unlawful regulatory taking of [its] property without just compensation." (Id. at p. 27.) The Just Compensation Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, mandates that "private property" shall not "be taken for public use, without just compensation." U.S. CONST. amend. V; Givens v. Ala. Dep't of Corr., 381 F.3d 1064, 1066 (11th Cir. 2004). While the classic form of taking occurs when a governmental entity exercises its power of eminent domain through formal condemnation proceedings, a taking can also occur where a governmental entity exercises its police power through regulation which restricts the use of property. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005); A.A. Profiles, Inc. v. Ft. Lauderdale, 850 F.2d 1483, 1486 (11th Cir. 1988). D&D has not alleged a classic taking here and has instead alleged a regulatory taking, which occurs when governmental regulation of private property is "so onerous that its effect is tantamount to a direct appropriation or ouster." Lingle, 544 U.S. at 537. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992).

The Supreme Court has "generally eschewed any set formula for determining how far is too far," instead "preferring to engag[e] in . . . essentially ad hoc, factual inquiries." Id. at 1015 (internal quotations omitted); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978) ("[T]his Court . . . has been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government.") (internal quotations omitted). This "ad hoc, factual inquir[y]" was first set forth in Penn Central Transportation Company, where the Supreme Court identified several, non-exhaustive factors for courts to consider in determining whether a regulatory taking has occurred: (1) "[t]he economic impact of the regulation on the claimant," (2) "interfere[nce] with distinct

investment-backed expectations," and (3) "the character of the governmental action." 438 U.S. at 124. The "Penn Central" inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539.

D&D argues that it is entitled to summary judgment on its takings claim because it has satisfied all three prongs of the Penn Central test. (Doc. 100, pp. 20–25.) In its Motion for Summary Judgment, the City argues that D&D's takings claim fails because: (1) D&D has failed to prove an economic impact sufficient to establish such a claim; (2) D&D has failed to sufficiently prove an investment-backed expectation; and (3) D&D never pursued any less-intensive, alternative development of the Subject Property, thus the takings claim is not ripe. (Doc. 86-1, pp. 2, 21–35.) Because ripeness is a threshold issue, the Court must first determine whether D&D's takings claim is ripe for adjudication.

**B. Ripeness of D&D's Takings Claim**

Under Article III of the United States Constitution, federal courts are limited to the adjudication of actual "cases" or "controversies." U.S. CONST. art. III, § 2, cl. 1. "The case-or-controversy restriction imposes what are generally referred to as 'justiciability' limitations." Strickland v. Alexander, 772 F.3d 876, 882 (11th Cir. 2014). "Three strands of justiciability doctrine—standing, ripeness, and mootness— . . . go to the heart of the Article III case or controversy requirement." Harrell v. Fla. Bar, 608 F.3d 1241, 1247 (11th Cir. 2010) (internal quotations and alterations omitted). Ripeness relates to when a suit may be properly asserted. Elend v. Basham, 471 F.3d 1199, 1205 (11th Cir. 2006). The purpose of the ripeness doctrine is "to avoid entangling courts in the hazards of premature adjudication." Shorter v. Warden, 803 F. App'x 332, 335 (11th Cir. 2020). "A claim is not ripe for adjudication if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal quotations and citation omitted). Ripeness directly implicates subject matter jurisdiction. Bauknight v. Monroe Cnty., Fla., 446 F.3d 1327, 1331 (11th Cir. 2006). The Court must therefore determine whether Plaintiff's takings claim is ripe for adjudication before proceeding with this case.

In Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985), the United States Supreme Court explained the requirement that a takings claim must be ripe. Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001). The Court held that a takings claim challenging the application of land-use regulations is not ripe unless "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Id. (quoting Williamson Cnty., 473 U.S. at 186); see also Exec. 100, Inc. v. Martin Cnty., 922 F.2d 1536, 1541 (11th Cir. 1991) ("In order to establish the ripeness of their equal protection claims, the plaintiffs must show only that the Board has made a final decision denying commercial zoning."); Sunrise Builders, Inc. v. Clayton Cnty., No. 1:21-CV-00715-ELR, 2021 WL 12300168, at *3 (N.D. Ga. July 13, 2021) ("In a case challenging the application of regulations to property, a claim is not ripe until the government entity charged with implementing the regulations reaches a final decision regarding the applications . . . at issue."). A final decision by the responsible state agency informs the constitutional determination whether a regulation has defeated the reasonable investment-backed expectations of the landowner to the extent that a Penn Central taking has occurred. Palazzolo, 533 U.S. at 618 (citing Penn Central, 438 U.S. at 124). These matters cannot be resolved in definitive terms until a court knows "the extent of permitted development" on the land in question. Id. (quoting MacDonald, Sommer & Frates v. Yolo Cnty., 477 U.S. 340, 351 (1986)).

"Once the government is *committed to a position*, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution." Pakdel v. City & Cnty. of San Francisco, 594 U.S. 474, 479 (2021) (emphasis added). The central question in resolving the ripeness issue is whether D&D obtained a final decision from the City determining what—if anything—would be a permissible use for the Subject Property.

The final decision requirement set forth in Williamson County "responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer." Suitum v. Tahoe Reg'l Plan. Agency, 520 U.S. 725, 738 (1997). "While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." Palazzolo, 533 U.S. at 620. But the final decision requirement "is not satisfied when a developer submits, and a land-use authority denies, a grandiose development proposal, leaving open the possibility that lesser uses of the property might be permitted." Id. at 619. The denial of a substantial project "leav[es] doubt whether a more modest submission or an application for a variance would be accepted." Id. at 620 (citing MacDonald, 477 U.S. at 342 (denial of 159-home residential subdivision); Williamson County, 473 U.S. at 182 (476-unit subdivision)). Cases such as Williamson County and MacDonald "stand for the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation." Id. A takings claim based on a law or regulation alleged to go too far in burdening property turns on the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the

property, including the opportunity to grant any variances or waivers allowed by law. Id. at 620–21. "As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established." Id. at 621.

The City argues that D&D's takings claim is premature because the final decision requirement is not satisfied as "D&D never attempted to pursue any less intensive or alternative use of the property after the denial of the Remainder Site Plan," and specifically, "did not submit a scaled-down proposal or seek approval for any modified use." (Doc. 86-1, pp. 33–34.) The City argues that rather than pursuing any less intensive or alternative use of the property, "following the denial, D&D did nothing further with the property and immediately filed suit against the City." (Id.) The City contends that by doing so, D&D "left unanswered the essential question of what, if any, development would be permitted on the property." (Doc. 126, p. 12.) The City further argues that "the record here provides compelling evidence that some scaled-back use would have been approved." (Doc. 86-1, p. 34.) The City relies on its appraisal expert, Robert Driggers' testimony that "[i]t seems reasonable based on the zoning that varying types of retail and office could be developed there, branch banks, other medical clinics, general retail. Any number of things." (Id. (quoting doc. 91, p. 9).) The City notes that it had approved the OSC, which it argues "demonstrates that reasonable, smaller-scale development was possible." (Id.)

"It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination *of the type and intensity of development legally permitted* on the subject property." MacDonald, 477 U.S. at 348 (emphasis added). "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." Id. As the Supreme Court has noted, "[r]ejection of exceedingly grandiose development

plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." Id. at 353 n.9. But D&D argues that its "purported failure to pursue a less intensive development does not render its claims unripe for review." (Doc. 134, pp. 14–19.) Specifically, D&D argues that "there can be no dispute that D&D followed the City's procedures for a site plan application in compliance with the then-existing site planning ordinances, and the City *twice* denied the application; thus the City's ripeness argument cannot stand." (Id. at p. 15.) D&D also relies on Palozzolo, arguing that it followed the "reasonable and necessary steps" to allow the City to exercise its full discretion in considering development plans for the Subject Property. (Doc. 134, pp. 14–15 (citing 533 U.S. at 607, 620–21).) D&D argues that, as in Palozzolo, there is "no indication" here the City would have accepted the application had D&D's plan occupied a smaller surface area. (Id. (quoting Palozzolo, 533 U.S. at 620).)

In Palozzolo, the plaintiff landowner's attempt to build residential structures on wetlands along a beach was denied by the Rhode Island Coastal Resources Management Council. Palozzolo, 533 U.S. at 611. While the Rhode Island trial and appellate courts ruled for the government, based in part on plaintiff's failure to explore any other use for the property that would involve filling substantially less wetlands, the Supreme Court reversed. Id. at 619–25. The Rhode Island Supreme Court had relied on the suggestion that, "while the Council rejected petitioner's effort to fill all of the wetlands, and then rejected his proposal to fill 11 of the wetland acres, perhaps an application to fill (for instance) 5 acres would have been approved," thus reasoning that the court "cannot know for sure the extent of permitted development on petitioner's wetlands." Id. at 619. The Supreme Court disagreed, arguing that such reasoning "is belied by the unequivocal nature of the wetland regulations at issue and by the Council's application of the regulations to the subject property." Id. As the Supreme Court explained, the property in question was classified as

a type of body of water that landowners are prohibited from filling or building residential structures next to without seeking a special exception from the Council. Id. The Council could allow the exception only where a "compelling public purpose" was served. Id. The Council determined that the proposed use did not satisfy the "compelling public purpose" standard, and the Supreme Court found that "[t]here is no indication the Council would have accepted the application had petitioner's proposed beach club occupied a smaller surface area." Id. at 620. The Supreme Court determined that "the permissible uses of the property are known to a reasonable degree of certainty," and clarified that the case "is quite unlike those . . . which ar[i]se when an owner challenge[s] a land-use authority's denial of a substantial project, leaving doubt whether a more modest submission or an application for a variance would be accepted." Id.

Here, the Remainder Site Plan was initially before the Council for approval during its December 2019 meeting. (Doc. 100-1, p. 19; doc. 120-1, p. 18; see generally doc. 100-38.) Before hearing from D&D's representatives, a Council member made a motion to deny the Remainder Site Plan, stating that it would adversely affect the neighborhood and that it is also a public safety concern. (Doc. 100-1, p. 19; doc. 120-1, p. 18; doc. 100-38, pp. 5–6.) The City Council denied the Remainder Site Plan, but the record does not indicate that the City provided specific reasons for its denial, which ordinance it relied on to deny the Remainder Site Plan, or what section(s) of the MOD the Remainder Site Plan violated. (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-38.) In June 2020, D&D again submitted the Remainder Site Plan application in materially identical form to what it had just submitted in November 2019 (and which had been denied in December 2019). (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-43, pp. 10–11.) On reconsideration, the Planning Commission recommended that the plan be approved; however, the City Council again denied the Remainder Site Plan on August 3, 2020. (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc.

100-43, p. 11.) To be sure, the language in the May 2019 MOD Amendment required the City to "consider the effect of this Ordinance on properties which are adjacent to the overlay district in all decisions," and it provided that, "[w]here development within the overlay district may pose an adverse effect on adjacent properties, Mayor and Council may place additional requirements, including without limitation, design standards, height requirements, architectural design standards, types of materials, etc. on projects in the Overlay District." (Doc. 100-15, p. 2.) But the City has not stated to D&D—nor does it appear D&D has inquired—what could be done differently for the development of the Subject Property to be deemed permissible (i.e., what "type and intensity" of development would be considered acceptable), and there was no indication which, if any, of the ten criteria of the site plan approval process were not satisfied. The Subject Property is within the MOD, which expressly allows for "upper story residential" uses along with commercial uses on the ground floor of buildings. (Doc. 100-1, p. 4; doc. 120-1, p. 2; see doc. 100-10, pp. 2–3.) At most, D&D has the opinion of one Council member that the proposed development would "adversely affect the neighborhood" and that it is "a public safety concern," but this says nothing about what could be done differently within the site plan to mitigate these concerns. (Doc. 100-38, p. 5.) The record does not show that D&D sought any variances or waivers allowed by law and, as noted, the June 2020 Remainder Site Plan application was materially identical to the November 2019 Remainder Site Plan application. (Doc. 100-1, p. 20; doc. 120-1, p. 19.) Given the City's rejections of the Remainder Site Plan, the Court cannot assess the Subject Property now because it is unclear—even at a general level—what the City would consider a permitted use of the land.

To be clear, the "[r]ipeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on [his land] only

if there is uncertainty as to the land's permitted use." Palozzolo, 533 U.S. at 622. Here, even viewing the record in the light most favorable to Plaintiff, the permissible uses of the Subject Property are not known to a reasonable degree of certainty and doubt remains as to whether a more modest submission or an application for a variance would be accepted. To reiterate, "[f]or an agency decision to ripen a property owner's takings claim, it must possess two basic characteristics—that it be a *final* decision, and that it demonstrate the extent to which use of the subject property will be allowed under the applicable regulations." Bailey v. United States, 78 Fed. Cl. 239, 252 (2007). "This second characteristic may be either explicit or implicit in the decision, or established by showing the futility of further attempts by the property owner to obtain permission to use the property." Id. at 252 n.25 (citing Palazzolo, 533 U.S. at 619–22; Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004); Cooley v. United States, 324 F.3d 1297, 1302 (Fed.Cir. 2003)). Here, the City simply has not conveyed, explicitly or implicitly, how D&D may use the Subject Property. The record lacks information as to what aspect(s) of the plan the City found unacceptable (or even troubling). Further, D&D has not "show[n] the futility of further attempts . . . to obtain permission to use the property" because it has not submitted a site plan that differs in some appreciable way from what it has submitted. Id.

Accordingly, the D&D's takings claim is unripe for review and the Court **GRANTS** the City's Motion for Summary Judgment as to D&D's takings claim (Count I). (Doc. 86.) Because D&D's takings claim is not ripe for review, the Court **DENIES** D&D's request for injunctive relief and an award based on a temporary taking. (Doc. 100, pp. 29–31.)

## II. Due Process Claim (Count II)

D&D alleges that the May 2019 MOD Amendment violates the Fifth and Fourteenth Amendments on its face because it is unconstitutionally vague, arbitrary, and capricious.[3] (Doc. 18, p. 29.) D&D also alleges that the City violated its due process rights because the application of the May 2019 MOD Amendment to deny D&D's request for the Remainder Site Plan approval was unconstitutional.[4] (Id. at p. 30.)

On May 20, 2019, the City adopted the May 2019 MOD Amendment, adding the following language:

> In fulfilling the purpose and intent of the overlay district, Mayor and Council shall consider the effect of this Ordinance on properties which are adjacent to the overlay district in all decisions. Where development within the overlay district may pose an adverse effect on adjacent properties, Mayor and Council may place additional requirements, including without limitation, design standards, height requirements, architectural design standards, types of materials, etc., on projects in the Overlay District.

(Doc. 100-1, p. 16; doc. 120-1, p. 16; doc. 100-15, p. 2.) D&D submitted the Remainder Site Plan in November 2019, which differed from the withdrawn 2018 Site Plan because it did not include plans for the OSC. (Doc. 100-1, p. 18; doc. 120-1, p. 18; doc. 134-1, p. 27.) The City denied the

---

[3] In its Motion for Summary Judgment, D&D also argues that "the City withheld the April 9, 2019, Clean Letter and Deprived D&D notice and an opportunity to be heard." (Doc. 100, p. 26.) As the City notes in its Response, (doc. 120, pp. 15–18), D&D has not pleaded a procedural due process claim in its Amended Complaint, (see doc. 18). D&D explains that it "previously abandoned its claim for violation of its procedural due process rights," but "did so without the knowledge that the City had received the April 9th Clean Letter," and that "it intends to move to file an amended complaint based on this newly discovered and highly material evidence, to assert a claim that the City violated its rights to procedural due process, and to request injunctive relief for the violation in the issuance of the permit." (Doc. 100, p. 26 n.9.) But as it has not done so, this issue is not properly before the Court.

[4] In its ruling on the City's Motion to Dismiss, the Court found that both denials of the Remainder Site Plan constituted executive acts which cannot support a substantive due process claim. The Court thus dismissed D&D's due process claim to the extent that Plaintiff seeks to challenge the executive acts of the Council in denying the Remainder Site Plan under substantive due process. (Doc. 45, pp. 15–26, 30.)

Remainder Site Plan application in December 2019. (Doc. 100-1, p. 20; doc. 120-1, p. 19; doc. 100-38.) D&D argues that "the triggering language of the [May 2019 MOD Amendment], 'adverse effect on adjacent properties', is undefined and completely subjective." (Doc. 100, p. 28 (quoting doc. 32, p. 15).) D&D argues that the City's "sole basis" for denying the Remainder Site Plan in December 2019—that it would "adversely affect the neighborhood," and is "a public safety concern"—"illustrates the problem perfectly." (Id. (quoting doc. 100-38, p. 25).)

In asserting an as-applied challenge, a plaintiff must show that the regulation has been applied to his property. Eide v. Sarasota Cnty., 908 F.2d 716, 724 (11th Cir. 1990). "If the authority has not reached a final decision with regard to the application of the regulation to the landowner's property, the landowner cannot assert an as applied challenge to the decision because, in effect, a decision has not yet been made." Id. at 725. Indeed, the Court must know "the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." MacDonald, 477 U.S. at 351. As discussed in Discussion Section I.B, supra, a final decision has not yet been reached as to the application of the May 2019 MOD Amendment to the Subject Property. Accordingly, D&D's as-applied due process claim is not ripe for review. See Strickland v. Alderman, 74 F.3d 260, 265 (11th Cir.1996) ("As applied due process and equal protection claims are ripe for adjudication when the local authority has rendered its final decision with respect to the application of the regulation.").

In cases involving both as-applied and facial challenges to a statute, the Supreme Court has "strongly admonished that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute." Sterigenics, 2023 WL 11911003, at *9 (quoting Commodity Trend Serv. v. CFTC, 149 F.3d 679, 683 (7th Cir. 1998)) (alterations adopted); see also Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502 (1985) (refusing to facially invalidate

statute because "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it"). Here, the same principles compel the Court not to reach the facial challenge to the ordinance. Because D&D's as-applied due process claim is not ripe for adjudication, the Court declines to reach D&D's claim that the May 2019 MOD Amendment is unconstitutionally vague.[5] Accordingly, the Court **DISMISSES** Count II.

## III. D&D's State Law Claims (Counts III & IV)

The Court may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). That said, "[s]upplemental jurisdiction is, by its very nature, not original but additional; that is, it relies on the existence of some other original basis of jurisdiction." Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1565 (11th Cir. 1994). Consequently, "[t]he federal courts of appeals . . . have uniformly held that once the district court determines that subject matter jurisdiction over a

[5] Further, in its Response to the City's Motion for Summary Judgment, D&D asserts that "if the Court agrees [with the City] that D&D's site plan was subject to the City's ordinances as revised after it submitted its site plan application in December of 2018, those ordinances were unconstitutionally vague because they invite[] arbitrary and capricious application, as demonstrated by the City during the hearing where it denied D&D's application." (Doc. 134, pp. 23–24.) It appears that D&D is arguing that it asserts its due process claim in the alternative to its vested rights claim. If, as D&D argues but the Court declines to decide, see Discussion Section II, supra, D&D has a vested right in the consideration of the Remainder Site Plan application under the laws in existence at the time it was originally submitted in December 2018 (putting aside the fact that it was later withdrawn), then the May 2019 MOD Amendment would not even apply to the Subject Property. "Where the ordinance did not apply to Plaintiff under the facts of this case, no injury it sustained will be redressed by a decision on its constitutionality." Sterigenics, 2023 WL 11911003, at *10. It is a "well-established rule of constitutional law" that "a party to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." Id. (quoting United States v. Di Pietro, 615 F.3d 1369, 1371 (11th Cir. 2010)). "This rule follows from the recognition that constitutional rights are personal in nature; that prudential concerns counsel for limiting the scope of constitutional adjudications; and that Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies." Id. (internal citations and quotations omitted).

plaintiff's federal claims does not exist, courts must dismiss a plaintiff's state law claims." Scarfo v. Ginsberg, 175 F.3d 957, 962 (11th Cir. 1999). Thus, if the Court lacks jurisdiction to adjudicate Plaintiff's federal claims, it retains no discretion to entertain Plaintiff's state law claims. See Alino v. Aerovias de Mexico, S.A., de C.V., 129 F. Supp. 2d 1341, 1345 (S.D. Fla. 2000) ("[O]nce the district court determines that subject matter jurisdiction over the plaintiff's federal claims does not exist, the court must dismiss the plaintiff's state law claims."); see also Nowak v. Ironworkers Loc. 6 Pension Fund, 81 F.3d 1182, 1188 (2d Cir. 1996) ("[S]ince a court must have original jurisdiction in order to exercise supplemental jurisdiction, a dismissal pursuant to Rule 12(b)(1) [for lack of jurisdiction] precludes a district court from exercising supplemental jurisdiction over related state claims."). This doctrine applies when, as here, a court dismisses a plaintiff's federal claims for lack of ripeness. See Paragon Mgmt., L.L.C. v. Slaughter, 437 F. Supp. 2d 1267, 1274 (N.D. Ala. 2006) ("Absent the presence of a federal case or controversy due to lack of standing and ripeness, it is inappropriate for the court to exercise supplemental jurisdiction under § 1367 with respect to any claims based upon state law."). Because the Court has dismissed all of Plaintiff's federal claims, through this Order and the Order on the Motion to Dismiss, (doc. 45), on jurisdictional grounds, the Court does not possess jurisdiction to entertain Plaintiff's state law claims.

Even if the Court had jurisdiction to entertain Plaintiff's state law claims, it would decline to exercise that authority. District courts may decline to exercise supplemental jurisdiction over such state law claims if: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). For that reason, the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam). The district courts' discretion extends to remanding cases properly removed to federal court. Carnegie-Mellon, 484 U.S. at 357.

Here, the factors contained in 28 U.S.C. § 1367(c) favor remand. First, in the interest of comity, allowing the state court to decide the remaining state law claims is preferred particularly given that the parties dispute the state law at issue and that application of that law to Plaintiff's state law claims. Second, all federal law claims are dismissed. Third, because of the dismissal of all federal claims, the remaining state law claims predominate over any claims over which the Court possesses original jurisdiction. Considering these factors, the Court exercises its discretion to remand the remaining state law claims (Counts III & IV).

## CONCLUSION

For the above reasons, the Court **GRANTS** the City's Motion for Summary Judgment, (doc. 86), and **DENIES** D&D's Motion for Summary Judgment, (doc. 100). Because the Court finds that D&D's takings claim is unripe for review, the Court **GRANTS** the City's Motion as to D&D's takings claim (Count I). (Doc. 86.) Because D&D's takings claim is unripe, the Court **DENIES** its request for injunctive relief and an award based on a temporary taking. (Doc. 100, pp. 29–31.) The Court **DISMISSES** D&D's due process claim (Count II) as unripe for review.

Because the Court has dismissed all of Plaintiff's federal claims on jurisdictional grounds, the Court does not possess jurisdiction to entertain Plaintiff's state law claims. The Court remands D&D's state law vested rights claim (Count III) and D&D's state law takings claim (Count IV).

The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment, **REMAND** the remaining state law claims to the Superior Court of Chatham County, and **CLOSE** this case.

**SO ORDERED**, this 28th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA